UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
UNITED STATES OF AMERICA,

            - against -                   **MEMORANDUM & ORDER**
                                          21-CR-269 (PKC)

KAREEM HASKINS,

                Defendant.
--------------------------------------------------------x
PAMELA K. CHEN, United States District Judge:

Defendant Kareem Haskins is charged with one count of possessing a firearm and ammunition as a convicted felon, in violation of 18 U.S.C. § 922(g)(1).  (Indictment, Dkt. 10.) The charge stems from Haskins being stopped and frisked the night of January 4, 2021, by two New York City Police Department ("NYPD") officers who were searching for the suspects in an attempted armed robbery.  Before the Court is Haskins' motion to suppress (1) all physical evidence obtained from Haskins after the stop commenced, (2) all pre-*Mirandized* statements made during the stop, and (3) the results of a show-up identification made by the complainant in the attempted armed robbery.  (Motion to Suppress ("Suppression Mot."), Dkt. 17.)  If the show-up identification is suppressed, Defendant also moves to preclude an in-court identification by the complainant.  (*See id.* at 9.)  The government has clarified that it will only seek to introduce statements made by Haskins before he was handcuffed (March 8, 2022 Transcript ("Tr.") at 100:4–6, 13–18), and that it will not seek to admit an in-court identification, even if the show-up identification is suppressed (*see* Tr. at 138:5–8).  In light of these concessions and for the reasons explained below, the motion to suppress is DENIED with respect to the evidence obtained and statements made during the stop, and GRANTED with respect to the show-up identification.

# BACKGROUND

## I.    Procedural History

Defendant Haskins was indicted on May 18, 2021.  (Indictment, Dkt. 10.)  On December 8, 2021, Haskins filed the pending motion to suppress.  (Suppression Mot., Dkt. 17.)  The government filed an opposition on January 10, 2022.  (Government's Memorandum of Law in Opposition to the Defendant's Motion to Suppress ("Gov. Opp."), Dkt. 21.)  Haskins filed a reply on February 28, 2022.  (Reply Memorandum of Law in Support of Motion to Suppress Physical Evidence, Statements & Identification ("Haskins Reply"), Dkt. 24.)

On March 8, 2022, the Court held an evidentiary hearing on the motion.  (03/08/2022 Minute Entry.)  At the hearing, the two NYPD officers who arrested Haskins, Officers Alan Lee and Daniel Defrancesco, testified.  (*See* Tr. at 4, 141.)  The Court also admitted the following exhibits:

- The NYPD radio run about the incident.  (Radio Run, Gov. Ex. 1.)

- Footage from Officer Defrancesco's body-worn camera ("body camera"). (Defrancesco Body Cam., Gov. Ex. 2.)

- Footage from Officer Lee's body camera.  (Lee Body Cam., Gov. Ex. 3.)

- Footage from the body camera of NYPD Officer Michael Masella, who spoke with the 911 caller on the night of the incident and participated in the show-up identification.  (Masella Body Cam., Gov. Ex. 4; Gov. Opp., Dkt. 21, at 6.)

- An arrest photo of Haskins.  (Photo, Def. Ex. A.)

- A large map of the area where the attempted robbery and arrest occurred, with markings made by Officer Lee during the hearing.  (Map, Gov. Ex. 6.)

- A smaller version of the same map.  (Gov. Ex. 7.)

- A Sprint Report related to the incident.  (Gov. Ex. 8.)

(Tr. at 167:24–168:9.)

The parties submitted post-hearing briefing on April 15, 2022 (Government Post-Hearing Brief ("Gov. Br."), Dkt. 27; Kareem Haskins' Post-Hearing Brief in Support of Motion to Suppress Physical Evidence ("Haskins Br."), Dkt. 28), and the Court heard oral argument on the motion on May 2, 2022 (May 2, 2022 Transcript).  Based on all of the evidence presented at the hearing, including the testimony of Officers Lee and Defrancesco,[1] the Court makes the following factual findings.

## II.   Factual Findings

At the time of Haskins's arrest on the night of January 24, 2021, Officers Lee and Defrancesco had been NYPD officers for five and three years, respectively.  (Tr. at 4:24, 141:13–18.)  Both had been assigned to the 60th Precinct, which covers Coney Island, the entire time.  (Tr. at 5:7, 6:1, 141:13–18.)  On the night of January 24, 2021, Officers Lee and Defrancesco were working together, patrolling the 60th Precinct in a marked police vehicle and responding to 911 calls on a shift that started at 11:15 p.m. on January 24 and ended at 7:50 a.m. on January 25.  (Tr. at 5:19–23, 7:20–8:23, 141:19–142:2.)  Officer Lee was driving the vehicle, which was patrol car 60C, or as Officers Lee and Defrancesco referred to it, "Six-O-Charlie."  (Tr. at 8:25, 36:22.)

Around 2:29 a.m., Officers Lee and Defrancesco were stationed near the Coney Island boardwalk, when NYPD dispatch radioed that their car should re-route to a "52 dispute with a firearm" at 2842 West 15th Street and Neptune, because a 911 caller had reported that he had been "held at gunpoint by two males."  (Tr. at 9:17–24; Radio Run, Gov. Ex. 1, at 0:00–12.)  A "52 dispute with a firearm" could mean anything from possession of a firearm to menacing with a firearm, but is distinct from robbery, which is coded as a "31."  (Tr. at 60:1, 74:19–75:1.)  Accordingly, despite hearing that the 911 caller was "held at gunpoint," Officers Lee and

---

[1] Except as noted below, the Court found both officers' testimony to be credible.

Defrancesco thought they were investigating a report of menacing with a firearm, not an armed robbery.[2]   (Tr. at 37:23–25, 60:11–61:18, 74:19–75:5, 129:3–12, 130:1–10, 142:18–23.)   The officers were informed that the 911 call came contemporaneously with the dispatch—at 2:29 a.m. (Tr. at 40:5–18, 41:7–10; Radio Run, Gov. Ex. 1, at 2:18.)

The officers were also given a description of the two suspects.   The first suspect was described as a "male, Black, about 6' 1'', 150 pounds, wearing a blue jacket, black pants, black mask, black beanie hat, slim build.   Torso.   Torso of jacket was blue, the rest is all black."  (Radio Run, Gov. Ex. 1, at 1:15–29.[3])   The second suspect was described as a Black male, 5' 11", 150 pounds, slim build, wearing grey sweatpants and a black jacket.  (Radio Run, Gov. Ex. 1, at 2:30–2:36.)

The officers were approximately two blocks from 2842 West 15th Street and Neptune at the time of the dispatch and immediately drove to the location.  (Tr. at 10:14–20.)   There were no lights at the intersection, so visibility was poor.  (Tr. at 148:8–13.)   When they arrived, no one was there.  (Tr. at 11:12–13, 29:4–6.)   The officers then continued their canvas of the area, driving in search of the suspects.  (Tr. at 11:14–22.)   Because they did not yet know the direction of flight, the officers drove to Stillwell Avenue and Mermaid Avenue, a train station and transportation hub to which Lee thought the perpetrators might flee after committing a crime.  (Tr. at 15:8–16:3,

---

[2] Although the radio run includes a conversation between the 911 operator and NYPD dispatcher discussing the fact that the incident was coded incorrectly and should have been coded as an attempted armed robbery, that conversation was not broadcast to the officers, and the NYPD dispatcher did not update the officers over the radio about the incorrect coding.  (Radio Run, Gov. Ex. 1, at 4:09–40; Tr. at 46:24–47:4, 76:3–7.)

[3] Shortly after the description was given the first time, someone asked dispatch to "go over the description again," and dispatch provided the following, slightly modified description: "It's going to be a male, black, about 6' 1'', 150 pounds, wearing a blue black jacket, blue . . . correction, black pants, black ski mask, black beanie hat, slim build with torso of the jacket is blue, the rest of the jacket is all black."  (Radio Run, Gov. Ex. 1, at 1:46–58.)

29:13–17, 29:22–24, 31:23–32:5; Radio Run, Gov. Ex. 1, at 3:05–12.)  The officers, however, did not see anyone matching the perpetrators descriptions at that intersection.  (Tr. at 16:4–7, 30:3–5.)

Dispatch then reported that, from Neptune and West 15th Street, the suspects had fled "up Mermaid towards 16/17 Street," thus heading westward.  (*See* Radio Run, Gov. Ex. 1, at 3:52–57, Tr. at 31:23–32:8, 46:1–3.)  Based on this information, the officers drove westward, zigzagging up and down the numbered streets between Neptune Avenue and Surf Avenue—the avenues on either side of Mermaid Avenue—from West 15th Street to West 21st Street.  (Tr. at 30:7–31:1, 31:23–32:8, 46:14–20, 145:1–3; Map, Gov. Ex. 6.)

Roughly five minutes passed from the time the officers received the initial dispatch, during which time the officers covered more than 15 blocks and saw between two and five other individuals, but no pairs of individuals.  (Tr. at 16:12–24, 19:3–10, 42:9–15, 63:25–64:3, 64:6–10, 83:18–84:19, 123:22–124:4, 124:7–12; *see* Map, Gov. Ex. 6; *see also* Radio Run, Gov. Ex. 1, at 5:38–42 (Lee reporting stop of two individuals five minutes and 38 seconds from first dispatch).) Each time they saw an individual on the street, they assessed whether they believed that the person matched either of the descriptions, but had so far seen no one whom they believed matched either description.  (Tr. at 19:3–10, 63:25–64:3, 123:13–124:9.[4]

Then, as the officers turned onto Neptune Avenue between West 21st St and West 22nd Street, Officer Lee spotted someone whom he believed matched the description of the second suspect, walking in the same direction as the officers' vehicle, on Lee's side of the vehicle, *i.e.*, the driver's side.  (Tr. at 16:12–24, 17:4–6, 42:9–15, 83:18–84:19, 116:15–18.)  Lee pulled up alongside this person and slowed down almost to a stop.  (Tr. at 16:12–24, 82:11–12, 84:1–19.)

---

[4] While Officer Lee recalls seeing two to five individuals on the streets at this point, Officer Defrancesco does not recall seeing anyone.  (Tr. at 145:6–12.)  Given Officer Lee's more specific account, the Court finds Officer Lee's account more accurate on this point.

As Lee observed this person, the person kept glancing back at the officers. (Tr. at 113:5–14, 148:22–149:2.) Lee believed the person to be a Black male, approximately 5' 11", slim build, wearing a black jacket, and gray sweatpants. (*See* Tr. at 81:24–82:2, 113:20–25, 115:8–11, 126:14–17.[5])

As the officers' vehicle pulled alongside this person, Office Lee said to Officer Defrancesco, "[L]ook, that guy matches the description." (Tr. at 81:24–82:12, 84:1–19, 113:11–17.) At first, Defrancesco disagreed, saying that the person looked "feminine." (Tr. at 113:11–17, 139:15–25.[6]) Lee replied, "[N]o, that's definitely him," and radioed dispatch to repeat the description. (Tr. at 116:10–14, 139:20–21; Radio Run, Gov. Ex. 1, at 5:18–21.[7])

While observing the person in the gray sweatpants (the "Second Suspect"), Lee also noticed a second person—later identified as Haskins—walking roughly 20 feet in front of the Second Suspect, whom Lee believed matched the description of the first suspect. (Tr. at 17:18–

---

[5] At the hearing, Lee acknowledged that he did not focus on the color of the sweatpants. (Tr. at 126:21–22.) Defrancesco believed that the person's pants were black, as he later reported that night. (Tr. at 115:12–14, 154:5–13; Radio Run, Gov. Ex. 1, at 6:09–14.) This discrepancy does not change the Court's analysis, as discussed below.

[6] At the hearing, Defrancesco testified that he thought this person was 5' 6" or 5' 7", regular build, wearing a black hoodie, black pants, and black shoes. (Tr. at 104:25–105:23, 145:22–146:4; Defrancesco Body Cam., Gov. Ex. 2, at 5:09–11 (Defrancesco telling another officer that the person was 5' 6" and wearing all black).) Defrancesco did not recall that the second suspect was supposed to be wearing gray sweatpants, so he did not see the different colored pants as a discrepancy. (*See* Tr. at 162:4–6.) He did recall that this suspect was supposed to be 5' 11", but noted that the person was shorter than Haskins, and viewed the difference between 5' 6" or 5' 7" and 5' 11" to be a small discrepancy. (Tr. at 162:7–23.) He also noted that from the police vehicle, he could not make out an exact height. (Tr. at 163:3–7.)

[7] At the hearing, Defrancesco did not recall this conversation, instead remembering that the officers had agreed that both individuals matched the description. (Tr. at 146:6–9, 150:3–5.) The Court credits Officer Lee's more detailed account, in part, because it arguably was not helpful to the prosecution.

18:1, 83:12–21, 111:16–22, 146:10–11.[8])  Lee believed that Haskins and the other person were walking together because they were walking in the same direction at the same unusually quick pace.  (Tr. at 18:5–8, 112:3–25 (Lee explaining that it was not as if one person was "trying to go home" and the other was "trying to catch a bus.").[9])  Lee also observed Haskins make a quick glance back at the officers and then continue to walk forward briskly, which Lee considered suspicious based on his experience.  (Tr. at 85:3–8, 86:2–3, 116:24–117:4.)  While Lee acknowledged that Haskins did not speed up, the unusually quick speed that both Haskins and the other individual were walking at raised Lee's suspicions.  (Tr. at 85:21–86:2, 86:9–11, 117:8–18.[10])

---

[8] Officer Lee testified that the two men were roughly two house-lengths apart from each other, or 20 to 30 feet.  (Tr. at 17:18–18:1, 111:16–22.)  Defrancesco testified that they were roughly one house-length apart from each other, or 15 to 20 feet.  (Tr. at 146:10–11.)  This discrepancy does not affect the Court's analysis.

Defrancesco also recalls that it he, rather than Lee, first spotted Haskins.  (Tr. at 150:16–18.)  The Court again credits Officer Lee's testimony on this point.

[9] Defrancesco also thought that the two men appeared to be walking together, despite being 15–20 apart.  (Tr. at 148:17–28.)

[10] NYPD officers are generally required to complete a "stop report" every time they stop-and-frisk a member of the public, unless that stop results in an arrest.  (Tr. at 86:12–14); NYPD, *Police Encounters*, https://www1.nyc.gov/site/nypd/about/about-nypd/police-encounters.page (last visited Apr. 25, 2022).)  These stop reports were implemented as part of the remedial phase of a lawsuit in which a judge in the Southern District of New York found the NYPD's stop-and-frisk practices to be unconstitutional.  *See* Recommendation Regarding Stop Report Form, *Floyd v. City of New York*, No. 08-CV-1035 (AT), 2016 WL 3383356 (S.D.N.Y. Mar. 25, 2016).  In this case, even though Haskins was arrested, Lee completed a stop report.  (Tr. at 86:15–87:12.)  The stop report, however, did not include the facts that Haskins was walking with another individual, glanced back at Lee, or was walking at an unusually quick pace as justifications for the stop.  (*See* Tr. at 89:20–90:18.)  The Court notes that while Lee was not required to complete a stop report as to Haskins, he should have done so properly, given the important purpose these reports serve.  Fortunately, in this case, Lee's body camera captured a conversation he had with another officer that corroborates Lee's account of the stop.  In that conversation, Lee explained that, upon spotting the two individuals, he thought that they matched the descriptions, clearly indicating that he believed that they were together.  (Lee Body Cam., Gov. Ex. 3, at 11:24–11:52.)  While the Court admonishes Officer Lee for not properly filling out the stop report, for the purposes of this

When Lee saw Haskins, he believed that Haskins was a Black male, 6' or 6' 1" tall, 150 to 160 pounds, skinny build, wearing a blue bubble jacket and black ski mask.  (Tr. at 18:11–19:2, 124:25–125:1.)  Lee had heard the dispatcher say that the first suspect's jacket had a blue torso but was otherwise all black (Tr. at 38:17–19), but he had not clearly heard the word "torso" and focused on the first part of the description about a "blue jacket" (Tr. at 77:17–24, 126:5–7).  Lee also noticed that Haskins's pants were not black, and were a lighter color—a fact confirmed by an arrest photograph taken of Haskins that night—but Officer Lee did not believe that this fact meant that Haskins "didn't match the description."  (Tr. at 72:21–24, 124:20–22, 125:8–17; Photograph, Def. Ex. A.)  Lee believed that someone who had been held at gunpoint might not give a 100 percent accurate description, so he went by the general description given.  (Tr. at 127:10–15.)

When Defrancesco saw Haskins, he believed him to be a 6' 1", slim-built man, wearing a blue/black jacket, tan pants, black shoes, and a black mask.  (Tr. at 146:21–22.)  He saw no discrepancy between the jacket Haskins was wearing and the description given by dispatch, stating that he thought the description of the jacket was "blue/black," which meant navy.  (Tr. at 146:25–147:20.)  As to the pants, Defrancesco thought that that detail was the only one that was not consistent with the description given by dispatch.  However, Defrancesco considered the fact that when the officers had visited the location where the incident occurred, there was "no lighting whatsoever," it was dark out, and it was a dark street.  So, he thought the victim probably had not paid much attention to the pants and was more focused on the torso and upper body area of the perpetrator.  (Tr. at 148:8–13.)  The officers did not discuss with each other whether Haskins

suppression motion, the Court finds Officer Lee's testimony about seeing two individuals, believing that they were walking together, and believing that they glanced at the officers, to be credible.

matched the description, as they had for the other suspect.  (Tr. at 19:11–16, 48:23–49:1, 139:22–25; Radio Run, Gov. Ex. 1, at 5:38–42.[11])

After getting out of his vehicle, Officer Lee asked Haskins to stop and to speak with him about a 911 call that Lee had received earlier.  Lee also grabbed Haskins by the shoulder, and moved him approximately 5 feet to a position between Lee's police vehicle and a streetlight. Haskins was compliant throughout.  (Tr. at 20:9–12, 22:13–17, 23:14–15, 24:14–20, 25:3–13, 63:17–21, 93:3–5, 119:1–3.)  As Officer Lee approached Haskins, the Second Suspect reversed course, quickened his pace, and walked away from the officers.  He then turned the corner, never to be apprehended.  (Tr. at 20:21–25, 117:20–24, 118:5–6.)  Neither officer pursued the Second Suspect or ordered him to stop because the officers wanted to stay together with Haskins in case the situation got worse.  (Tr. at 21:7–9, 123:6–10.)  Defrancesco, however, put over the police radio the direction of flight for the Second Suspect.  (Tr. at 51:1–6; Radio Run, Gov. Ex. 1, at 6:10–16.)  Defrancesco also radioed that he and Lee did not need immediate assistance.  (Tr. at 51:8–23.)

After moving Haskins, Officer Lee immediately began to frisk him.  (Tr. at 25:15–16, 119:7–10.)  According to Officer Lee, he frisked Haskins because he believed that Haskins matched the description of a suspect in a crime that involved violence and a firearm, and thus the frisk was necessary to ensure the safety of the officers and anyone else who might be nearby.  (Tr. at 25:25–26:7.)  Defrancesco also testified that, at the time he exited the car, he believed that Haskins possessed a firearm because of the 911 call.  (Tr. at 151:21–24.)  As Lee frisked Haskins,

---

[11] Approximately seven seconds after Officer Lee had asked for dispatch to repeat the description, and immediately before Lee radioed that he had two Black men stopped, dispatch repeated the description as follows: "It's going to be two male Blacks.  The first one is about 6' 1'', 150 pounds, wearing a blue black jacket, black pants, black mask, black beanie hat.  He's slim build.  The torso of the jacket is blue, the rest is all black."  (Radio Run, Gov. Ex. 1, at 5:27–39.)

Lee asked Haskins if Haskins had any weapons on him.  At first, Haskins either did not reply or

said no.  However, around the time that Officer Lee placed his hand on a hard object in Haskins's

pocket, Lee asked again if Haskins had a weapon on him, to which Haskins replied that he did, in

his pocket.  (Tr. at 25:17, 26:20–23, 66:24–67:5, 119:8–24, 120:15–18.[12])  At that point, Lee began

to frisk Haskins more briskly.  (Tr. at 27:1–2; Defrancesco Body Cam., Gov. Ex. 2, at 0:20–30.)

Lee then found a black handgun in Haskins' right jacket pocket, removed it, placed it on the

ground, and placed Haskins in handcuffs.  (Tr. at 27:10–14, 120:15–21; Defrancesco Body Cam.,

Gov. Ex. 2, at 0:30–1:00.)

---

[12] For the most part, Officer Lee testified that Haskins told the officers that he had a gun in his pocket the first time that Lee asked him.  However, in the audio on Officer Lee's body camera, which began after Officer Lee had removed the gun from Haskins's pocket, Officer Lee is heard saying, "You said you had a gun, right?", to which Haskins responded, "Yeah, I told you."  But then Officer Lee said, "Well, you didn't tell me that the first time," to which Haskins replied, "You never asked me."  (Lee Body Cam., Gov. Ex. 3, at 1:00–1:12.)  In addition, as discussed below, Lee testified that he started to frisk Haskins more briskly when Haskins said that he had a gun (Tr. at 27:1–2), and on Defrancesco's body camera, Lee can be seen starting to frisk Haskins much more briskly after starting to feel a hard object in Haskins's pocket (Defrancesco Body Cam., Gov. Ex. 2, at 0:20–30).  At the evidentiary hearing, Officer Lee also acknowledged that he may have asked Haskins if he had a weapon prior to the time that Haskins said yes.  (*See* Tr. at 122:9–17.)  Furthermore, Officer Defrancesco testified that he turned his body camera on "around th[e] time" that Haskins said that he had a gun (Tr. at 155:12–21), and Defrancesco turned his body camera on after Officer Lee first felt the gun in Haskins's pocket, as described below (Defrancesco Body Cam., Gov. Ex. 1, at 0:20–1:10; Tr. at 65:21–66:15 (describing how the moment that a body camera beings recording audio indicates the moment that the body camera was turned on)).  Taken together, the Court finds that, at some time prior to Officer Lee placing his hand on the gun in Haskins's pocket, Officer Lee asked Haskins if he had weapon on him, and Haskins either did not respond or said no; and, around the time that Officer Lee placed his hand on the gun, he asked again, and Haskins said yes.

Thus, the Court does not credit Officer Lee's testimony that Haskins told him that he had a gun in his pocket some time before Officer Lee felt the gun (Tr. at 66:24–67:5), nor Defrancesco's testimony that Haskins said that he had a gun even before the officers grabbed him (Tr. at 153:7–16).  Based on the evidence outlined above, and the fact that Officer Lee was frisking Haskins very casually until he placed his hand on the gun (Defrancesco Body Cam., Gov. Ex. 2, at 0:00–20), the Court finds that the officers were, at a minimum, mistaken about this fact.  But this does not undermine Officer Lee's justification for frisking Haskins in the first instance, as discussed below.

After Officer Lee had handcuffed Haskins, Officers Lee and Defrancesco turned on their body cameras, with Officer Lee turning his on approximately ten seconds before Officer Defrancesco.  (*Compare* Lee Body Cam., Gov. Ex. 3, at 1:12 (capturing someone asking, "You got gloves?") *with* Defrancesco Body Cam., Gov. Ex. 2, at 1:00 (same).)  Because NYPD body cameras constantly record a 60-second loop of video, but not audio, when officers activate their body cameras, the prior 60 seconds of video, without audio, are preserved.  (Tr. at 65:21–66:15.) Officer Lee's body camera was covered by his jacket until he turned it on, so it recorded no images prior to him turning it on.  (Tr. at 99:4–9; Lee Body Cam., Gov. Ex. 3, at 0:00–1:00.)  Officer Defrancesco's body camera started recording images, but not video, after the officers had already detained Haskins and moved him to the location between their vehicle and the streetlight. (Defrancesco Body Cam., Gov. Ex. 2, at 00:00–20.)  Defrancesco's body camera captured Officer Lee calmly frisking Haskins, grabbing a hard object in Haskins's pocket, frisking Haskins much more rapidly, then removing a gun from Haskins's pocket and placing it on the ground, as described above.  (Defrancesco Body Cam., Gov. Ex. 2, at 0:00–1:00.[13])

---

[13] Lee testified that he did not activate his body camera upon stopping the car and approaching Haskins because he was "more worried about my safety and the safety of others around me."  (Tr. at 58:11–15.)  Looking back, Lee believes that he should have activated his camera earlier, in order to record this whole incident.  (Tr. at 58:16–22.)  According to Lee, however, doing so was not required by the NYPD Patrol Guide.  (Tr. at 59:5–16.)  At the time of Haskins's arrest, the Patrol Guide required officers to activate their body cameras when responding to incidents coded in the 30s, such as burglary, robbery, and larceny, but not for incidents coded in the 50s, such as this incident, a "52 dispute with a firearm." (Tr. at 59:5–60:10.)  However, Lee conceded that even at that time, the Patrol Guide required officers to turn on their body cameras when interacting with people suspected of criminal activity, and required all drivers of police vehicles to turn on their body cameras immediately after arriving at a location.  (Tr. at 97:9–23.) Lee emphasized, though, that officers are allowed to activate their body cameras at a "later time" under "extenuating circumstances."  (Tr. at 97:23–98:1.)  Defrancesco believed that the Patrol Guide required them to turn on their body cameras under the circumstances of this stop, but only if tactically appropriate, and noted that, in this case, where they were quickly approaching someone with a firearm, they wanted to move as quickly as possible.  (Tr. at 155:22–156:7.)  Given that the Court finds the officers' testimony generally credible, and largely confirmed by audio captured on

After removing the firearm from Haskins's pocket, Office Lee asked Haskins if there was ammunition in the gun, to which Haskins replied that there was.  (Lee Body Cam., Gov. Ex. 3, at 1:40–43; Defrancesco Body Cam., Gov. Ex. 2, at 1:30–1:36.)  Lee also asked Haskins why he had a gun, to which Haskins replied that he had it for protection.  (Lee Body Cam., Gov. Ex. 3, at 1:46–52; Defrancesco Body Cam., Gov. Ex. 2, at 1:36–42.[14])  Eventually, Officers Lee and Defrancesco placed Haskins in their police vehicle and began driving him back to the 60th Precinct.  (Lee Body Cam., Gov. Ex. 3, at 4:34, Defrancesco Body Cam., Gov. Ex. 2, at 4:24.)  Before leaving, Officer Lee noted that other officers were already with the original 911 caller.  (Lee Body Cam., Gov. Ex. 3, at 5:05–15; Tr. at 109:24–110:2 (explaining that C/V refers to the "complainant/victim").)

Meanwhile, other NYPD officers had arrived at the location of the original 911 caller. Their interaction with him was captured on Officer Masella's body camera.  (Masella Body Cam., Gov. Ex. 4.)  At least two NYPD officers met the 911 caller near where the attempted robbery had occurred.  (Masella Body Cam., Gov. Ex. 4, at 2:12–16.)  After the 911 caller exited an apartment, an officer told him that the police had a guy stopped by a police car.  (Masella Body Cam., Gov. Ex. 4, at 1:58–2:05.)  An officer then said, "We just need you to—" and the 911 caller interjected, "ID him?"  (Masella Body Cam., Gov. Ex. 4, at 1:58–2:05.)  An officer quickly replied, "Yeah." (Masella Body Cam., Gov. Ex. 4, at 2:04–06.)  Another officer then said, "And also tell us what happened."  (Masella Body Cam., Gov. Ex. 4, at 2:05–08.)  The 911 caller asked the officers if

---

the body cameras after they begin recording (including Haskins's own statements), the Court does not draw any negative inferences based on the officers' failure to turn on their body cameras as soon as they arrived at the location.

[14] Around this time, the focus of the conversation on the Radio Run switched to another incident.  The dispatcher radioed to patrol car 61B ("Six-One-Boy"), referring to a car from the neighboring 61st Precinct, and asked the officers in that car to investigate a reported larceny involving a person in a black jacket pushing an orange cart.  (Radio Run, Gov. Ex. 1, at 8:19–10:00; Tr. at 55:9–56:23.)

they wanted him to do the "ID" first, or tell them what happened first.  (Masella Body Cam., Gov. Ex. 4, at 2:08–12.)  An officer swiftly replied, "Both."  (Masella Body Cam., Gov. Ex. 4, at 2:12–13.)  The 911 caller then began to describe the attempted robbery.  (Masella Body Cam., Gov. Ex. 4, at 2:14–4:25.)  While the 911 caller was talking, an officer interrupted him to tell another officer, "They are transporting the guy back already," to which the other officer replied, "Well call them and tell them we need him for this."  (Masella Body Cam., Gov. Ex. 4, at 3:47–59.)  After the 911 caller finished describing the incident, an officer asked the 911 caller whether, if he saw the suspect, he would recognize him.  (Masella Body Cam., Gov. Ex. 4, at 4:25–30.)  The 911 caller responded, "Not facial-wise, just by what he's wearing."  (Masella Body Cam., Gov. Ex. 4, at 4:30–34.)  Officers then drove the 911 caller to the location where Haskins had been arrested by Officers Lee and Defrancesco.  (Masella Body Cam., Gov. Ex. 4, at 6:20–8:37.)

Meanwhile, as Officers Lee and Defrancesco were driving Haskins to the precinct, Lee's Sergeant directed him to turn around and return to where he had arrested Haskins, which Lee did.  (Tr. at 131:19–132:8, 156:20–158:8; Lee Body Cam., Gov. Ex. 3, at 8:25–52; Defrancesco Body Cam., Gov. Ex. 2, at 8:25–45.)  After arriving back at the location, where there were now numerous police vehicles, Lee took Haskins, holding him by the arm, and paraded him in front of a marked police vehicle in which the 911 caller was sitting.  (Lee Body Cam., Gov. Ex. 3, at 12:03–12:55; Defrancesco Body Cam., Gov. Ex. 2, at 11:49–12:45; Masella Body Cam., Gov. Ex. 4, at 6:20–8:40.)

An NYPD officer inside the vehicle with the 911 caller told him to look out the window, and asked, "Anyone you recognize?"  (Masella Body Cam., Gov. Ex. 4, at 8:37–40.)  The 911 caller responded, "Yeah, this was the . . . ."  and an officer cut in to say, "That was him.  Okay."  (Masella Body Cam., Gov. Ex. 4, at 8:40–47.)  The officers asked no follow-up questions.

Officers Lee and Defrancesco then placed Haskins back in their police vehicle and drove him to the 60th Precinct, which took less than three minutes.  (Lee Body Cam., Gov. Ex. 3, at 12:55–15:40; Defrancesco Body Cam., Gov. Ex. 2, at 12:45—15:30.)  Simultaneously, the 911 caller was also taken to the 60th Precinct to give a report.  (Masella Body Cam., Gov. Ex. 4, at 9:00–38.)

## DISCUSSION

### I.      Request to Suppress the Physical Evidence

#### A.      Legal Standard

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const., amend. IV. "As this language indicates, the ultimate measure of the constitutionality of a government search or seizure is reasonableness."  *United States v. Compton*, 830 F.3d 55, 61 (2d Cir. 2016). "Reasonableness is generally determined by balancing the particular need to search or seize against the privacy interests invaded by such action."  *Id.*  Searches and seizures conducted without a warrant that is based on probable cause are presumptively unreasonable, "subject only to a few specifically established and well-delineated exceptions."  *United States v. Weaver*, 9 F.4th 129, 138 (2d Cir. 2021) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).  When a search or seizure is conducted without a warrant, the burden is on the government to establish that the search or seizure fits within one of the exceptions to the warrant requirement.  *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993) (citing, *inter alia*, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)).

One such exception is a stop-and-frisk, which is a limited investigatory stop followed by a limited pat-down for weapons.  *Maryland v. Buie*, 494 U.S. 325, 332 (1990); *Weaver*, 9 F.4th at 138 (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).  A stop-and-frisk does not require probable cause,

14

but can be based instead on "reasonable suspicion," which is a lower standard.  *United States v. Patterson*, 25 F.4th 123, 135 (2d Cir. 2022) (citing *Kansas v. Glover*, ___ U.S. ___, ___, 140 S. Ct. 1183, 1187–88 (2020)).  Reasonable suspicion is not a high standard.  *Id.* at 136 (citing *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997)).  It requires more than an "inarticulate hunch." *Compton*, 830 F.3d at 61 (brackets omitted) (quoting *Terry*, 392 U.S. at 22).  But it is satisfied where an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion."  *Weaver*, 9 F.4th at 140 (quoting *Terry*, 392 U.S. at 21).  Reasonable suspicion is an objective, not subjective, standard.  *Id.*  In determining whether an officer had reasonable suspicion to conduct a stop-and-frisk, a court must take into account "the totality of the circumstances" and "evaluate those circumstances through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training."  *Compton*, 830 F.3d at 61.  Under this standard, certain facts might "dispel reasonable suspicion," such as when "an officer knows that the registered owner of the vehicle is in his mid-sixties but observes that the driver is in her mid-twenties."  *Glover*, ___ U.S. at ___, 140 S. Ct. at 1191.

Furthermore, a stop-and-frisk requires two levels of reasonable suspicion: one for the stop and one for the frisk.  *Weaver*, 9 F.4th at 139.  To initiate the stop, an officer must have reasonable suspicion that the person being stopped "was involved in or is wanted in connection with a completed felony."  *Id.*  To conduct a subsequent frisk, which constitutes a greater intrusion, an officer must have reasonable suspicion that the person is "armed and dangerous."  *Id.* (quoting *Terry*, 392 U.S. at 30).  The stop is justified on less than probable cause because of the government's interest in "effective crime prevention and detection," and the frisk is justified on less than probable cause because of "the need for law enforcement officers to protect themselves

15

and other prospective victims of violence." *Id.* (quoting *Terry*, 392 U.S. at 10, 22).  Both stops and frisks must be justified at their inception, not by facts that emerge after the stop or frisk commences.  *Id.* at 140 (citing *Glover*, ___ U.S. at ___, 140 S. Ct. at 1191).

### B.   Application

Under the totality of the circumstances, Officer Lee had reasonable suspicion to both stop and frisk Haskins.  As to the stop, Officer Lee had a description of two suspects involved in a dispute with a firearm, during which a person was held at gunpoint.  (Tr. at 9:17–24; Radio Run, Gov. Ex. 1, at 0:00–12.)  Officer Lee went to the location of the incident, which had no lighting and was extremely dark.  (Tr. at 10:14–20, 148:8–13.)  He then proceeded to the primary transportation hub in the area to look for suspects.  (Tr. at 15:8–16:3, 29:13–17, 29:22–24; Radio Run, Gov. Ex. 1, at 3:05–12.)  While there, he received information on the suspects' direction of flight.  (*See* Radio Run, Gov. Ex. 1, at 3:52–57, Tr. at 31:23–32:8, 46:1–3.)  He zigzagged over cross streets in that direction, covering more than 15 blocks.  (Tr. at 30:7–31:1, 31:23–32:8, 46:14–20, 145:1–3; Map, Gov. Ex. 6.)  During the approximately five-minute period after receiving the dispatch, Officer Lee had seen only two to five individuals on the street.  (Tr. at 16:12–24, 19:3–10, 42:9–15, 63:25–64:3, 64:6–10, 83:18–84:19, 123:22–124:4, 124:7–12; *see* Map, Gov. Ex. 6; *see also* Radio Run, Gov. Ex. 1, at 5:38–42.)  Each time he saw an individual, he assessed whether they matched the description.  (Tr. at 19:3–10, 63:25–64:3, 123:13–124:9.)  Over those five minutes, until he saw Haskins and the Second Suspect, he saw no one else who matched the descriptions, and no other pairs of individuals.  (Tr. at 16:12–24, 19:3–10, 42:9–15, 63:25–64:3, 64:6–10, 83:18–84:19, 123:22–124:4, 124:7–12.)  Then, as he turned onto Neptune Avenue between West 21st Street and West 22nd Street, he observed an individual whom believed matched the description of the Second Suspect.  (Tr. at 16:12–24, 42:9–15, 83:18–84:19.)  In arguing that this person did not match the description of the Second Suspect, Haskins relies on the fact that

16

Defrancesco initially believed that the person might be female and reported that the person was shorter than the description—5' 6" or 5' 7" instead of 5' 11"—and wearing black instead of gray pants.  (Haskins Br., Dkt. 28, at 11–12.)  Officer Lee, however, disagreed with Defrancesco's belief that the person did not match the description, even at the time.  (Tr. at 116:10–14, 139:20–21.)  Officer Lee's perception of the Second Suspect almost completely matched the description of that suspect.  (*Compare* Radio Run, Gov. Ex. 1, at 1:45–1:58 (conveying description of suspect) *with* Tr. at 81:24–82:2, 113:20–25, 115:8–11, 126:14–17 (Lee's perception of the suspect).)  Furthermore, Lee was closer than Defrancesco to the Second Suspect, who was on the driver's side of the vehicle, and Officer Lee also thought that the Second Suspect kept glancing back at the officers and was walking at an unusually quick pace.  (Tr. at 18:5–8, 112:3–25, 113:5–14, 148:22–149:2.)

Then, while watching the Second Suspect, Officer Lee spotted Haskins walking roughly 20 feet in front of the Second Suspect, at the same unusually quick pace, giving Lee the impression that the two men were together.  (Tr. at 17:18–18:1, 18:5–8, 83:12–21, 111:16–22, 112:3–25, 146:10–11.)  According to Officer Lee, Haskins, like the Second Suspect, also glanced at the officers in a way that, based on Lee's experience as an officer, raised his suspicions.  (Tr. at 85:3–8, 86:2–3, 116:24–117:4.)  Furthermore, Lee believed that Haskins matched the description of the first suspect.  (Tr. at 18:11–19:2, 124:25–125:1.)  Lee's perception of Haskins was indeed a near match with Lee's recollection of the description of the first suspect.  (*Compare* Tr. at 12:4–21 (Lee's recollection of the description conveyed by NYPD dispatch) *with* Tr. at 18:11–19:2, 124:25–125:1 (Lee's perception of Haskins).)

Defendant argues that Haskins did not match the description of the first suspect because of his jacket and pants.  (Haskins Br., Dkt. 28, at 10–11.[15])  As to the discrepancy in the jacket, the Court finds Officer Lee's confusion about the description entirely reasonable.  Dispatch did indeed first describe the jacket as "blue, black jacket" but then amended the description to blue torso and the rest being all black.  (Radio Run, Gov. Ex. 1, at 1:46-58.)  Officers Lee and Defrancesco were both confused by this description, but in different ways, with Officer Lee finding it hard to make out the word "torso" on the recording, even in the calm of the courtroom (Tr. at 77:17–24, 126:5–7), and Officer Defrancesco believing that dispatch had said "blue/black," meaning navy (Tr. at 146:25–127:20).  Under these circumstances, the Court finds it objectively reasonable for Officer Lee to have relied on the general description that he believed he had heard, *i.e.*, a blue jacket.  While an officer who negligently fails to listen to, or completely disregards, a suspect's a description would not get the benefit of this failure to justify a stop, that is not the case here.

As to the pants, Officer Lee explained that he did not focus on the pants when he first spotted Haskins, but acknowledged that Haskins' pants were lighter than the description.  (Tr. at 72:21–24, 124:20–22, 125:8–17.)  Lee did not believe that this discrepancy meant that the person did not match the description or was not the suspect, because Lee imagined that someone held at gunpoint might not have focused on the color of the perpetrator's pants; so, Lee relied on the

---

[15] Defendant also argues that "Haskins was wearing a black ski mask, not a black beanie hat as the description detailed."  (Haskins Br., Dkt. 28, at 11.)  This is unavailing.  One of the descriptions of the first suspect did, in fact, state that the suspect was wearing a ski mask.  (Radio Run, Gov. Ex. 1, at 1:46–58.) ("It's going to be a male, black, about 6' 1'', 150 pounds, wearing a blue black jacket, blue . . . correction, black pants, black ski mask, black beanie hat, slim build with torso of the jacket is blue, the rest of the jacket is all black.").)  Taken together, the dispatch described the suspect as wearing a black ski mask and a black beanie hat, and the "ski mask" that Haskins was wearing was not the type that covers a person's face, but instead covers the top of one's head (like a beanie), as well as the person's ears and neck, leaving the face uncovered.  (*See generally*, Lee Body Cam., Gov. Ex. 3.)  The Court does not find this to be a discrepancy.

suspect's general description.  (Tr. at 127:10–15.)  The Court also finds this to be objectively reasonable under the circumstances.  Indeed, it is consistent with a growing body of science around "weapon focus," where eyewitnesses held at gunpoint focus on weapons being pointed at them and thus their recollection of other details becomes less clear.  *See* National Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 93 (2014) ("[W]eapon focus studies found that the presence of a weapon reduced both identification accuracy and feature accuracy (e.g., the eyewitness' ability to recall clothing, facial features, and more).");  *see also United States v. Nolan*, 956 F.3d 71, 80 (2d Cir. 2020) (favorably citing *Identifying the Culprit: Assessing Eyewitness Identification*).  While this recognized phenomenon does not justify an officer stopping any person who looks vaguely like a description of a suspect, that is not what occurred here. Rather, Officer Lee was discerning about whom he stopped that evening, assessing whether that person matched the description Lee recalled receiving from dispatch.

Defendant argues that two Black men walking down the same street, apart, cannot support reasonable suspicion "in the absence of matching descriptions," and that a person being Black in a majority Black neighborhood also cannot support reasonable suspicion.  (Haskins Br., Dkt. 28, at 13–15.)  Generally, Haskins attempts to strike each element supporting reasonable suspicion for having a slight variance or infirmity, but courts "do not subject factors pertaining to an officer's reasonable suspicion to such a 'divide-and-conquer analysis.'"  *United States v. Santillan*, 902 F.3d 49, 58 (2d Cir. 2018).  Furthermore, as discussed, the Court does not find that this is a case with an "absence of matching descriptions."  (Haskins Br., Dkt. 28, at 13–15.)  The Court also

does not find that this was a case where Officer Lee relied on race alone, or even primarily, but on a constellation of facts of which race was only one.[16]

Under the circumstances of this case, Officer Lee could "point to specific and articulable facts which, taken together with rational inferences from those facts," would lead a "reasonable and cautious police officer on the scene" to believe that Haskins "was involved" in the reported menacing with a firearm. *Weaver*, 9 F.4th at 139–40 (quoting *Terry*, 392 U.S. at 21); *Compton*, 830 F.3d at 61. As to the frisk, because Officer Lee reasonably believed that Haskins was involved in the reported menacing with a firearm, he could also "point to specific and articulable facts which, taken together with rational inferences from those facts," would lead a "reasonable and cautious police officer on the scene" to believe that Haskins was "armed and dangerous." *Weaver*, 9 F.4th at 139–40 (quoting *Terry*, 392 U.S. at 21); *Compton*, 830 F.3d at 61. Although the videos and testimony demonstrate that Haskins was compliant throughout the stop, the Court does not find this fact was sufficient to "dispel" the reasonable suspicion that Haskins was armed and dangerous. *Glover*, ___ U.S. at ___, 140 S. Ct. at 1191. For the safety of the officers and the public, Officer Lee was justified in completing the pat-down in order to "confirm or dispel" the reasonable suspicion that Haskins was armed and dangerous. *See Patterson*, 25 F.4th at 140.

---

[16] The Court finds Defendant's reliance on *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006), to be unavailing. (Haskins Br., Dkt. 28, at 13.) In that case, a 911 caller reported being robbed by two "African-American males between 15 and 20 years of age, one 5' 8" and the other 6', wearing dark, hooded sweatshirts." *Brown*, 448 F.3d at 241. Several minutes later, officers observed two Black men exit a store with cups of coffee. *Id.* at 242. Both were wearing dark clothing, but one was 27 and 6', the other was 31 and 5' 8", and both had full beards. *Id.* While the heights matched, the difference between 15–20-year-olds and people in their late 20s and early 30s is significant, particularly since the arrestees had full beards, a fact one would expect to be conveyed in the description of the suspects. Those facts, along with the fact that the arrestees were walking out of a store with coffees shortly after an alleged robbery where they were the only Black people in a mostly white neighborhood, are the types of facts that should "dispel reasonable suspicion." *Glover*, ___ U.S. at ___, 140 S. Ct. at 1191. There is simply nothing similar at play here, except for perhaps the color of Haskins's pants, which the Court addressed above.

Accordingly, the motion to suppress is denied with respect to Defendant's request to suppress the physical evidence obtained after the stop.

## II.    Request to Suppress the Pre-*Miranda* Statement

### A.    Legal Standard

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  U.S. Const., amend. V.  Under the Fifth Amendment, statements obtained from a suspect who is in custody, being interrogated by law enforcement, and has not been given *Miranda* warnings typically cannot be used in the government's case in chief. *United States v. Ferguson*, 702 F.3d 89, 93 (2d Cir. 2012).  The Supreme Court and Second Circuit, however, have recognized a "public safety" exception to that rule.  *United States v. Estrada*, 430 F.3d 606, 610 (2d Cir. 2005) (citing *New York v. Quarles*, 467 U.S. 649, 655–56 (1984)).  Under the public safety exception, "*Miranda* warnings need not precede questions reasonably prompted by a concern for the public safety or for the safety of the arresting officers for a suspect's answers to be admitted as evidence of his guilt."  *United States v. Simmons*, 661 F.3d 151, 155 (2d Cir. 2011).

The Second Circuit has outlined three factors that are persuasive in upholding the denial of a motion to suppress on the basis of the public safety exception: (1) whether the questioning "related to an *objectively* reasonable need to protect the police or the public from any immediate danger"; (2) whether the objective facts "suggest that the questioning was a subterfuge, designed solely to elicit testimonial evidence from a suspect," or was instead "generally targeted at a safety concern"; and (3) whether the questions were "routinely put to arrested suspects" or were instead "supported by an objectively reasonable need to protect against a perceived danger."  *Ferguson*, 702 F.3d at 94 (internal quotation marks and citations omitted).

### B.      Application

The government has indicated that it does not intend to introduce any of the statements made by Haskins that were captured on the body cameras during the stop.  (Tr. at 100:4–6, 13–18.)[17]  The government seeks to introduce only statements made by Haskins prior to the body cameras beginning to record audio, presumably through the testimony of Officer Lee.  (Tr. at 100:4–6, 13–18.)  The question and answer at issue, then, are Officer Lee asking Haskins if he had a firearm on him, and Haskins replying yes, in his pocket.  (Tr. at 25:17, 26:20–23, 66:24–67:5, 119:8–24, 120:15–18.)  With respect to Lee's question, the Court finds that it was "reasonably prompted by a concern for the public safety or for the safety of the arresting officers," and thus the public safety exception to *Miranda* applies.  Haskins's affirmative response therefore may be "admitted as evidence of his guilt."  *Simmons*, 661 F.3d at 155.

First, given Officer Lee's reasonable belief that Haskins was armed and dangerous, the question was "related to an *objectively* reasonable need to protect the police or the public from any immediate danger."  *Ferguson*, 702 F.3d at 94.  Just as the Court does not find that Haskins's initial compliance negated the justification for patting down Haskins, the Court does not find that his compliance made it unreasonable for Lee to believe that Haskins posed a risk of immediate danger to the officers and the public.  Second, there is nothing to "suggest that the questioning was a subterfuge, designed solely to elicit testimonial evidence from a suspect."  *Id.*  Instead, the evidence presented at the hearing establishes that Lee's question was "generally targeted at a safety

---

[17] That is an appropriate course of action because those statements—made while Haskins was handcuffed, being fully compliant, and surrounded by officers, and after the gun had been removed from him—were responses to questions that cannot be said to be "reasonably prompted by a concern for the public safety or for the safety of the arresting officers."  *Simmons*, 661 F.3d at 155.

concern." *Id.* Third, there is no evidence about whether Lee's question is "routinely put to arrested suspects." *Id.*

Thus, given that Officer Lee had reasonable suspicion to believe that Haskins menaced someone with a firearm shortly before he was stopped the night of January 24, 2021, Lee's question to Haskins about whether he was armed was "supported by an objectively reasonable need to protect against a perceived danger." *Ferguson*, 702 F.3d at 94 (internal quotation marks and citations omitted). Accordingly, the motion to suppress is denied with respect to Defendant's request to suppress his pre-*Mirandized* statement.[18]

## III.   Request to Suppress the Show-Up Identification

### A.   Legal Standard

"Due process requires that criminal trials proceed consistently with that fundamental fairness which is essential to the very concept of justice." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001). "When the prosecution offers testimony from an eyewitness to identify the defendant as a perpetrator of the offense, fundamental fairness requires that that identification testimony be reliable." *Id.* (citing, *inter alia*, *Manson v. Brathwaite*, 432 U.S. 98, 112–14 (1977)). "When the defendant objects to identification testimony to be given by a witness who has identified him prior to trial," the court conducts a sequential, two-step inquiry. *Id.* First, the court must determine "whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Id.* "If the procedures were not suggestive," the identification

---

[18] At this stage, Haskins almost exclusively argues that his pre-*Miranda* statements should be suppressed as fruits of the poisonous tree from his unlawful stop. (Haskins Br., Dkt. 28, at 15–16.) Because the Court finds that the stop was lawful, as explained above, this argument is unavailing. Before the evidentiary hearing, however, Haskins also asserted that the circumstances of the stop, in particular, Haskins's compliance from the moment he was stopped, would not justify admitting the statements under the public safety exception. (Haskins Reply, Dkt. 24, at 9–11.) Accordingly, the Court has addressed that argument above.

evidence may be admitted.  *Id.*  If, however, the court finds that procedures surrounding the identification were unnecessarily suggestive, the court should proceed to the second step and determine whether "the identification was nonetheless independently reliable."  *Id.*

At the first step, "an identification procedure may be deemed unduly and unnecessarily suggestive if it is based on police procedures that create 'a very substantial likelihood of irreparable misidentification.'"  *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009) (quoting *Simmons v. United States*, 390 U.S. 377, 384 (1968)).  To be sure, show-up identifications are controversial.  *Id.* (noting that show-up identifications have been "widely condemned") (quoting *Stovall v. Denno*, 388 U.S. 293, 302 (1967)).  On the one hand, a show-up identification has "a very valid function: to prevent the mistaken arrest of innocent persons."  *United States v. Bautista*, 23 F.3d 726, 730 (2d Cir. 1994).  Accordingly, the Second Circuit has instructed law enforcement that, "where an officer has or should have doubts whether a detained suspect is in fact the person sought, the officer must make immediate reasonable efforts to confirm the suspect's identity."  *Id.*  On that basis, the Second Circuit has permitted the admission of identification evidence from show-ups "held in close temporal and geographic proximity to the crime scene."  *Brisco*, 565 F.3d at 89.  On the other hand, a show-up identification is "inherently suggestive because it involves the presentation of a single suspect to a witness by the police (as opposed to a lineup, in which several individuals are presented to the police, only one of whom is the suspect)."  *Id.* at 88 (citing *Stovall*, 388 U.S. at 302).  The Second Circuit has thus found a show-up identification to be improperly suggestive where "[n]o pressing necessity dictated that the police use a show-up instead of a line-up," *Styers v. Smith*, 659 F.2d 293, 297 (2d Cir. 1981) (citing *Stovall*, 388 U.S. at 302), particularly when combined with "notification to a witness that a suspect has been picked up," *id.*  Ultimately, "a claimed violation of due process in the conduct of a confrontation depends on the totality of the

circumstances surrounding it." *Brisco*, 565 F.3d at 88 (quoting *Stovall*, 388 U.S. at 302).  Thus, "a

showup identification violates due process only if it is an '*unnecessarily* suggestive' procedure."

*Id.* (quoting *Stovall*, 388 U.S. at 302).

If a court concludes that procedures surrounding the identification were unnecessarily

suggestive and proceeds to considering whether the identification was nonetheless independently

reliable, the Court then considers the "*Biggers* factors," laid out in the Supreme Court case of *Neil*

*v. Biggers*, 409 U.S. 188, 199–200 (1972).  *Brisco*, 565 F.3d at 89.  Those factors are: (1) "the

opportunity of the witness to view the criminal at the time of the crime," (2) "the witness' degree

of attention," (3) "the accuracy of the witness' prior description of the criminal," (4) "the level of

certainty demonstrated by the witness at the confrontation, and" (5) "the length of time between

the crime and the confrontation."  *Id.* (quoting *Biggers*, 409 U.S. at 199–200).  "None of these

factors standing alone is dispositive of the existence of independent reliability; instead, reliability

is assessed in light of the totality of the circumstances."  *Id.*

## B.    Application

The Court finds that the show-up identification conducted in this case was unduly and

unnecessarily suggestive.[19]  Although the show-up was "held in close temporal and geographic

proximity to the crime scene," *Brisco*, 565 F.3d at 88, it is clear that there was no "pressing

---

[19] The government represents that it would introduce the identification evidence not through the testimony of any witnesses, but through the body camera footage.  (Tr. at 138:5–8.)  At the evidentiary hearing, the government originally said that it was not going to seek to introduce the identification at all, emphasizing that attempted robbery is not charged in this case.  (Tr. at 132:20, 133:23–134:6.)  After a break in the proceedings, however, the government decided that it did not want to foreclose the possibility of introducing the identification at trial.  (Tr. at 136:18–24.)  In its post-hearing briefing, the government argues that the identification should be admitted at trial.  (Gov. Br., Dkt. 27, at 8–10.)  Yet, at the hearing, the government continued to acknowledge—seemingly inconsistently—that an *in-court* identification by the complainant would be inappropriate since he stated that he could only identify the suspect based on clothing. (Tr. at 137:25–1388.)

necessity" for the show-up identification, *Styers*, 659 F.2d at 297, and that the way in which the identification was conducted created a "substantial likelihood of irreparable misidentification," *Brisco*, 565 F.3d at 88.

As to the show-up identification being unnecessarily suggestive, there can be no doubt that Haskins was going to remain in custody on the night of January 24, 2021, and that Officer Lee was convinced that he had arrested the right person, given Lee's belief that Haskins matched one of perpetrators' description and the fact that Haskins had a gun on him when he was stopped.  (Tr. at 17:18–18:1, 83:12–21, 111:16–22, 127:22–128:2, 146:10–11.)  Indeed, at the time it was decided that a show-up identification would be conducted, Lee and Defrancesco had already arrested Haskins and were driving him back to the precinct.  (Tr. at 131:19–132:8, 156:20–158:8; Lee Body Cam., Gov. Ex. 3, at 8:25–52; Defrancesco Body Cam., Gov. Ex. 2, at 8:25–45.)  That Haskins was not going to be released that night undermines the legitimate purpose for conducting a show-up identification: "to prevent the mistaken arrest of innocent persons."  *Bautista*, 23 F.3d at 730.  That conclusion is almost comically bolstered here by the fact that, after conducting the show-up with Haskins and the 911 caller, officers drove *both* Haskins and the 911 caller to the precinct.  (Lee Body Cam., Gov. Ex. 3, at 12:55–15:40; Defrancesco Body Cam., Gov. Ex. 2, at 12:45–15:30; Masella Body Cam., Gov. Ex. 4, at 9:00–38.)  Clearly "[n]o pressing necessity dictated that the police use a show-up instead of a line-up."  *Styers*, 659 F.2d at 297. [20]

As to the show-up identification being "unduly" suggestive, virtually every aspect of the show-up identification procedure strongly suggested to the 911 caller that Haskins was one of the

---

[20] Nothing in the record explains why a line-up identification procedure was not conducted at the precinct that night (Tr. at 158:9–22, 159:10-17 (Defrancesco testifying that the detective squad always conducts lineups and conceding, on cross-examination, that there is a night-watch detective squad)), or thereafter, though the Court assumes that the officers believed that the show-up identification was sufficient—a belief with which the Court does not agree.

perpetrators of the armed robbery.  As captured on Officer Masella's body camera, the officers who picked up the 911 caller from his apartment told him that officers had a guy stopped by a police car, thus "notif[ying the] witness that a suspect ha[d] been picked up."  (Masella Body Cam., Gov. Ex. 4, at 1:58–2:05); *Styers*, 659 F.2d at 297.  Indeed, when one of the officers started to explain to the 911 caller, "We just need you to—," the 911 caller immediately interjected, "ID him?," to which the officer responded, "Yeah."  (Masella Body Cam., Gov. Ex. 4, at 1:58–2:06.) The 911 caller also was in a position to overhear the officers say that Haskins had already been taken to the precinct, which again suggested that the officers believed Haskins was the perpetrator and further suggested that they had enough evidence to arrest him, even without the 911 caller's identification.[21]  (Masella Body Cam., Gov. Ex. 4, at 3:47–59.)  At the show-up itself, Haskins was removed from the back of a police vehicle, in handcuffs, at an intersection where numerous other police vehicles were gathered with their lights flashing, and was paraded by the police vehicle containing the 911 caller, singly, with Officer Lee holding Haskins by the arm—all of which strongly suggested both that Haskins was the perpetrator and already in custody.  (Lee Body Cam., Gov. Ex. 3, at 12:03–12:55; Defrancesco Body Cam., Gov. Ex. 2, at 11:49–12:45; Masella Body Cam., Gov. Ex. 4, at 8:37–40.)  The Court finds that the totality of circumstances surrounding the

---

[21] One officer said to another, "They are transporting the guy back already," to which the other officer replied, "Well call them and tell them we need him for this."  (Masella Body Cam., Gov. Ex. 4, at 3:47–59.)  From this exchange, the average person could have readily inferred that the police had arrested someone for the crime whom the officers were "transporting" to the precinct.  Furthermore, based on the 911 caller's conversations with the officers, he appeared to be savvier than the average person.  For example, the 911 caller described to officers how he kept his wallet in his breast pocket and knew to place his back against a wall if he was jumped.  (Masella Body Cam., Gov. Ex. 4, at 2:14–4:25.)  Similarly, as discussed, when an officer initially sought to explain to the 911 caller that, "We just need you to—," the caller interjected, "ID him?"  (Masella Body Cam., Gov. Ex. 4, at 1:58–2:05.)

show-up make this case very similar to *Styers*, where the Second Circuit found the show-up to be unduly suggestive.  659 F.2d at 297.

The Court also concludes that the identification was not independently reliable despite the unduly and unnecessarily suggestive procedures.  As to the first and second *Biggers* factors—the "the opportunity of the witness to view the criminal at the time of the crime" and "the witness' degree of attention"—both were hindered by the presence of the gun, as noted in this Court's discussion of reasonable suspicion for the stop-and-frisk.  *Biggers*, 409 U.S. at 199–200; National Research Council, *Identifying the Culprit: Assessing Eyewitness Identification* 93 (2014).  That is confirmed by the 911 caller's own statement that he could not recognize the suspect "facial-wise," but only by clothing.  (Masella Body Cam., Gov. Ex. 4, at 4:30–34.)  Indeed, for that reason, the government concedes that an in-court identification by the 911 caller would not be appropriate in this case.  (Tr. at 138:5–8.)[22]

With respect to "the accuracy of the witness' prior description of the criminal," the mere fact that the 911 caller could not identify the suspect "facial-wise" dramatically limits the accuracy of his identification of Haskins.  Additionally, the fact that Haskins's pants were light green, as opposed to black (as reported by the 911 caller), weighs more heavily against the reliability of the 911 caller's identification of Haskins, than it did in determining whether Officers Lee and Defrancesco had reasonable suspicion to stop Haskins, especially given that the 911 caller could *only* identify the perpetrators by their clothing.  *Biggers*, 409 U.S. at 199–200.

---

[22] Again, that is an appropriate concession by the government, because an in-court identification on the day of trial, from a witness who acknowledged that he could only identify the suspect based on the clothing that the suspect was wearing on the day of the incident, would not be reliable, given that Hasksins would be wearing entirely different clothes at trial.  (Tr. at 79:11–20 (Officer Lee did not voucher Haskins's jacket or any of his other clothing as evidence.).)

Fourth, "the level of certainty demonstrated by the witness at the confrontation," leaves much to be desired. *Biggers*, 409 U.S. at 199–200. The 911 caller did not even finish telling the officers that he recognized Haskins before an officer jumped in and said, "That was him. Okay." (Masella Body Cam., Gov. Ex. 4, at 8:40–47.) Furthermore, no additional questions about certainty were asked, as one would expect, such as, "How certain are you that this is the suspect?" The officers did not even ask which of the two suspects, who were described as appearing differently, the 911 caller believed Haskins to be.

As to the fifth *Biggers* factor, the Court acknowledges that "the length of time between the crime and the confrontation" was brief. 409 U.S. at 199–200. However, "[n]one of th[e] factors standing alone is dispositive." *Brisco*, 565 F.3d at 89. The Court finds that the first four factors far outweigh the fifth, and under "the totality of the circumstances" here, the identification was not independently reliable. *Biggers*, 409 U.S. at 199–200. Accordingly, the show-up identification evidence must be suppressed.[23]

## CONCLUSION

For the reasons explained above, the motion to suppress is granted in part and denied in part. The request to suppress the physical evidence obtained during the stop-and-frisk is DENIED. The request to suppress the pre-*Miranda* statement is DENIED. And the request to suppress the show-up identification is GRANTED.

---

[23] At the evidentiary hearing, the Court asked the parties to brief the issue of whether the show-up identification would be admissible under the Federal Rules of Evidence, which the parties have done. The Court has serious doubts that the show-up identification would be admissible in this case, given that Haskins is only charged with being a felon in possession of a firearm and ammunition, and not attempted armed robbery, a more serious crime—a position the government initially agreed with. (Tr. at 132:20, 133:23–134:6.) However, the Court need not address that issue, given its finding that the identification evidence should be suppressed.

SO ORDERED.

/s/ Pamela K. Chen
Pamela K. Chen
United States District Judge

Dated:  May 9, 2022
        Brooklyn, New York